13-422-cv
The New York Times Company v. United States

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2013

Argued: October 1, 2013          Decided: April 21, 2014

Docket Nos. 13-422(L), 13-445(Con)

- - - - - - - - - - - - - - - - - - - - - - -
THE NEW YORK TIMES COMPANY, CHARLIE SAVAGE,
SCOTT SHANE, AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
    Plaintiffs-Appellants,

         v.


UNITED STATES DEPARTMENT OF JUSTICE, UNITED
STATES DEPARTMENT OF DEFENSE, CENTRAL
INTELLIGENCE AGENCY,
    Defendants-Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, CABRANES, and POOLER, Circuit Judges.

Appeal from the January 24, 2013, judgment of the United States District Court for the Southern District of New York (Colleen McMahon, District Judge), dismissing, on motion for summary judgment, a suit under the Freedom of Information Act seeking documents relating to targeted killings of United States citizens carried out by drone aircraft.

We conclude that (1) a redacted version of the OLC-DOD

Memorandum must be disclosed, (2) a redacted version of the classified <u>Vaughn</u> index (described below) submitted by OLC must be disclosed, (3) [redacted],[1] (4) the <u>Glomar</u> and "no number, no list" responses are insufficiently justified, (5) DOD and CIA must submit <u>Vaughn</u> indices to the District Court for <u>in camera</u> inspection and determination of appropriate disclosure and appropriate redaction, and (6) the OIP search was sufficient. We therefore affirm in part, reverse in part, and remand.

David E. McCraw, The New York Times Company, New York, N.Y. (Stephen N. Gikow, New York, N.Y., on the brief), for Plaintiffs-Appellants The New York Times Company, Charlie Savage, and Scott Shane.

Jameel Jaffer, American Civil Liberties Union Foundation, New York, N.Y. (Hina Shamsi, Brett Max Kaufman, American Civil Liberties Union Foundation, New York, N.Y., Joshua Colangelo-Bryan, Dorsey & Whitney LLP, New York, N.Y., Eric

---

[1] The redactions in the text of this opinion, most of which refer to the content of the OLC-DOD Memorandum, disclosure of which is the primary subject of this appeal, are being made at the request of the Government to preserve its opportunities for further appellate review of our ruling requiring disclosure of a redacted version of that Memorandum. In the event that our ruling requiring disclosure of a redacted version of the Memorandum is not altered in the course of any further appellate review, an unredacted version of this opinion, together with a redacted version of the OLC-DOD Memorandum, will be filed.

2

Ruzicka, Colin Wicker, Dorsey & Whitney LLP, Minneapolis, MN., on the brief), for Plaintiffs-Appellants American Civil Liberties Union and American Civil Liberties Union Foundation.

Sharon Swingle, U.S. Appellate Staff Atty., Washington, D.C. (Preet Bharara, U.S. Atty., Sarah S. Normand, Asst. U.S. Atty., New York, N.Y., Stuart F. Delery, Acting Asst. U.S. Atty. General, Washington, D.C., on the brief), for Defendants-Appellees.

(Bruce D. Brown, Mark Caramanica, Aaron Mackey, The Reporters Committee for Freedom of Press, Arlington, V.A., for amicus curiae The Reporters Committee for Freedom of Press, in support of Plaintiffs-Appellants.)

(Marc Rotenberg, Alan Butler, Ginger McCall, David Brody, Julia Horwitz, Electronic Privacy Information Center, Washington, D.C., for amicus curiae Electronic Privacy Information Center, in support of Plaintiffs-Appellants.)

JON O. NEWMAN, Circuit Judge:

This appeal of a judgment dismissing challenges to denials of requests under the Freedom of Information Act ("FOIA") presents important issues arising at the intersection of the public's opportunity to obtain information about their government's activities and the legitimate interests of the

3

Executive Branch in maintaining secrecy about matters of national security. The issues assume added importance because the information sought concerns targeted killings of United States citizens carried out by drone aircraft. Plaintiffs-Appellants The New York Times Company and New York Times reporters Charlie Savage and Scott Shane (sometimes collectively "N.Y. Times"), and the American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively "ACLU") appeal from the January 24, 2013, judgment of the United States District Court for the Southern District of New York (Colleen McMahon, District Judge) dismissing, on motions for summary judgment, their consolidated FOIA suits. See New York Times Co. v. U. S. Dep't of Justice ("Dist. Ct. Op."), 915 F. Supp. 2d 508 (S.D.N.Y. 2013). The suits were brought against the Defendants-Appellees United States Department of Justice ("DOJ"), the United States Department of Defense ("DOD"), and the Central Intelligence Agency ("CIA") (sometimes collectively the "Government").

We emphasize at the outset that the Plaintiffs' lawsuits do not challenge the lawfulness of drone attacks or targeted killings. Instead, they seek information concerning those attacks, notably, documents prepared by DOJ's Office of Legal Counsel ("OLC") setting forth the Government's reasoning as to

4

the lawfulness of the attacks.

The issues primarily concern the validity of FOIA responses that (a) decline to reveal even the existence of any documents responsive to particular requests (so-called "Glomar responses" (described below)), (b) acknowledge the existence of responsive documents but decline to reveal either the number or description of such documents (so-called "no number, no-list" responses (described below)), (c) assert various FOIA exemptions or privileges claimed to prohibit disclosure of various documents that have been publicly identified, notably the OLC-DOD Memorandum [redacted], and (d) challenge the adequacy of a FOIA search conducted by one office of DOJ.

We conclude that (1) a redacted version of the OLC-DOD Memorandum must be disclosed, (2) a redacted version of the classified Vaughn index (described below) submitted by OLC must be disclosed, (3) [redacted], (4) the Glomar and "no number, no list" responses are insufficiently justified, (5) DOD and CIA must submit Vaughn indices to the District Court for in camera inspection and determination of appropriate disclosure and appropriate redaction, and (6) the Office of Information Policy ("OIP") search was sufficient. We therefore affirm in part, reverse in part, and remand.

Background

The FOIA requests at issue in this case focus primarily on the drone attacks [redacted] that killed Anwar al-Awlaki[2] and Samir Khan in September 2011 and al-Awlaki's teenage son, Abdulrahman al-Awlaki, in October 2011. All three victims were United States citizens either by birth or naturalization.

Statutory Framework. FOIA provides, with exceptions not relevant to this case, that an "agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A) (2013). FOIA contains several exemptions, three of which are asserted in this case.

Exemption 1 exempts records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (2013). Executive Order 13526 allows an agency to withhold information that (1) "pertains

---

[2] This spelling, which we adopt (except in quotations), is used by the District Court and in the Government's brief. The briefs of N.Y. Times and ACLU and numerous documents in the record render the name "al-Aulaqi."

6

to" one of the categories of information specified in the Executive order, including "intelligence activities (including covert action)," "intelligence sources or methods," or "foreign relations or foreign activities of the United States" and (2) if "unauthorized disclosure of the information could reasonably be expected to cause identifiable and describable damage to the national security." Executive Order No. 13526 § 1.1(a)(3)-(4), 1.4(c)-(d), 75 Fed. Reg. 708, 709 (Dec. 29, 2009).

Exemption 3 exempts records that are "specifically exempted from disclosure by [another] statute" if the relevant statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(i), (ii) (2013). Two such statutes are potentially relevant here. The Central Intelligence Agency Act of 1949, as amended, provides that the Director of National Intelligence "shall be responsible for protecting intelligence sources or methods," and exempts CIA from "any other law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507 (2013). The

7

National Security Act of 1947, 50 U.S.C. § 3024-1(i)(1) (2013), exempts from disclosure "intelligence sources and methods."

Exemption 5 exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (2013). Exemption 5 encompasses traditional common law privileges against disclosure, including the attorney-client and deliberative process privileges. See National Council of La Raza v. Dep't of Justice, 411 F.3d 350, 356 (2d Cir. 2005).

The N.Y. Times FOIA requests and Government responses. Shane and Savage, New York Times reporters, submitted separate FOIA requests to OLC. Shane's request, submitted in June 2010, sought:

> all Office of Legal Counsel opinions or memoranda since 2001 that address the legal status of targeted killings, assassination, or killing of people suspected of ties to Al-Qaeda or other terrorist groups by employees or contractors of the United States government.

Joint Appendix ("JA") 296-97.

> Savage's request, submitted in October 2010, sought:

> a copy of all Office of Legal Counsel memorandums analyzing the circumstances under which it would be lawful for United States armed forces or intelligence community assets to target for killing a United States

8

citizen who is deemed to be a terrorist.

JA 300-01.

OLC denied Shane's request.  With respect to the portion of his request that pertained to DOD,  OLC initially submitted a so-called "no number, no list" response[3] instead of submitting the usual <u>Vaughn</u> index,[4] numbering and identifying by title and description documents that are being withheld and specifying the FOIA exemptions asserted.  A no number, no list response acknowledges the existence of documents responsive to the request, but neither numbers nor identifies them by title or description.  OLC said that the requested documents pertaining to DOD were being withheld pursuant to FOIA exemptions 1, 3, and 5.

As to documents pertaining to agencies other than DOD, OLC submitted a so-called "<u>Glomar</u> response."[5]  This type of response

---

[3] The term was apparently coined by CIA, <u>see</u> <u>Bassiouni v. CIA</u>, 392 F.3d 244, 246 (7th Cir. 2004), and the CIA's use of no number, no list responses to FOIA requests has been considered by district courts in the District of Columbia. <u>See</u> <u>National Security Counselors v. CIA</u>, 898 F. Supp. 2d 233, 284-85 (D.D.C. 2012); <u>Jarvik v. CIA</u>, 741 F. Supp. 2d 106, 123 (D.D.C. 2010).

[4] The term derives from <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973).

[5] The term derives from the <u>Hughes Glomar Explorer</u>, a vessel built to recover a sunken Soviet submarine. <u>See</u> <u>Phillippi v. CIA</u>, 546 F.2d 1009, 1010-12 (D.C. Cir. 1976).  A <u>Glomar</u> response was first used in 1992 in a case challenging a Government agency's refusal to confirm or

9

neither confirms nor denies the existence of documents responsive to the request. See Wilner v. National Security Agency, 592 F.3d 60, 68 (2d Cir. 2009). OLC stated that the Glomar response was given "because the very fact of the existence or nonexistence of such documents is itself classified, protected from disclosure by statute, and privileged" under 5 U.S.C. § 552(b)(1), (3), (5). CIA confirmed that it requested DOJ to submit a Glomar response on its behalf.[6]

OLC also denied Savage's request. Declining to submit either a Vaughn index or even a no number, no list response, OLC submitted a Glomar response, stating that, pursuant to Exemptions 1, 3, and 5, it was neither confirming nor denying the existence of documents described in the request. Unlike its letter denying the Shane request, OLC's response to the Savage request did not identify any responsive documents relating to DOD.

During the course of the litigation, OLC modified its responses to the Shane and Savage requests by identifying the

---

deny the existence of certain materials requested under FOIA, see Benavides v. DEA, 968 F.2d 1243, 1245 (D.C. Cir. 1992).

[6] CIA made one exception to its request that OLC submit a Glomar response. Because CIA's involvement in the operation that resulted in the death of Osama bin Laden had been acknowledged and was not classified, the agency asserted that any OLC documents related to the agency's involvement in that operation would not be covered by a Glomar response, but added that there were no such documents.

10

existence of one document pertaining to DOD, what the District Court and the parties have referred to as the OLC-DOD Memorandum, but claimed that this document was exempt from disclosure under Exemption 5. Because the OLC-DOD Memorandum was classified, it was presumably also withheld under Exemption 1. As to all other DOD documents, it is not clear whether OLC was continuing to assert a Glomar response, as it had made to Shane, or a no number, no list response, as it had made to Savage.

The ACLU FOIA requests and Government responses. In October 2011, ACLU submitted FOIA requests to three agencies: DOJ (including two of DOJ's component agencies, OIP and OLC), DOD, and CIA. The requests, quoted in the margin,[7] sought

---

[7]

1. All records created after September 11, 2001, pertaining to the legal basis in domestic, foreign, and international law upon which U.S. citizens can be subjected to targeted killings, whether using unmanned aerial vehicles ("UAVs" or "drones) or by other means.

2. All records created after September 11, 2001, pertaining to the process by which U.S. citizens can be designated for targeted killings, including who is authorized to make such determinations and what evidence is needed to support them.

3. All memoranda, opinions, drafts, correspondence, and other records produced by the OLC after September 11, 2001, pertaining to the legal basis in domestic, foreign, and international law upon which the targeted killing of Anwar al-Awlaki was authorized and upon which he was killed, including discussions of:

   A. The reasons why domestic-law prohibitions on murder,

11

assassination, and excessive use of force did not preclude the targeted killing of al-Awlaki;

B. The protection and requirements imposed by the Fifth Amendment Due Process Clause;

C. The reasons why International-law prohibitions on extrajudicial killing did not preclude the targeted killing of al-Awlaki;

D. The applicability (or non-applicability) of the Treason Clause to the decision whether to target al-Awlaki;

E. The legal basis authorizing the CIA, JSOC, or other U.S. Government entities to carry out the targeted killing of Anwar Al-Awlaki;

F. Any requirement for proving that al-Awlaki posed an imminent risk of harm to others, including an explanation of how to define imminence in this context; and

G. Any requirement that the U.S. Government first attempt to capture Al-Awlaki before killing him.

4. All documents and records pertaining to the <u>factual basis for the targeted killing</u> of Al-Awlaki, including:

A. Facts supporting a belief that al-Awlaki posed an imminent threat to the United States or United States interests;

B. Facts supporting a belief that al-Awlaki could not be captured or brought to justice using nonlethal means;

C. Facts indicating that there was a legal justification for killings persons other than al-Awlaki, including other U.S. citizens, while attempting to kill al-Awlaki himself;

D. Facts supporting the assertion that al-Awlaki was operationally involved in al Qaeda, rather than being involved merely in propaganda activities; and

12

various documents concerning the targeted killings of United States citizens in general and al-Awlaki, his son, and Khan in particular.

Both OLC and CIA initially submitted <u>Glomar</u> responses, refusing to confirm or deny the existence of responsive documents, pursuant to Exemptions 1, 3, and 5.

DOD initially stated that it could not respond to the request within the statutory time period because of the scope and complexity of the request.

During the course of the litigation, the Government agencies

---

E. Any other facts relevant to the decision to authorize and execute the targeted killings of al-Awlaki.

5. All documents and records pertaining to the <u>factual basis for the killing</u> of Samir Khan, including whether he was intentionally targeted, whether U.S. Government personnel were aware of his proximity to al-Awlaki at the time the missiles were launched at al-Awlaki's vehicle, whether the United States took measures to avoid Khan's death, and any other facts relevant to the decision to kill Khan or the failure to avoid causing his death.

6. All documents and records pertaining to the <u>factual basis for the killing</u> of Abdulrahman al-Awlaki, including whether he was intentionally targeted, whether U.S. Government personnel were aware of his presence when they launched a missile or missiles at his location, whether he was targeted on the basis of his kinship with Anwar al-Awlaki, whether the United States took measures to avoid his death, and any other factors relevant to the decision to kill him or the failure to avoid causing his death.

JA 252-53.

13

modified their original responses in light of statements by senior Executive Branch officials on the legal and policy issues pertaining to United States counterterrorism operations and the potential use of lethal force by the United States Government against senior operational leaders of al-Qaeda who are United States citizens.

OLC provided ACLU with a <u>Vaughn</u> index of sixty unclassified responsive documents, each described as an e-mail chain reflecting internal deliberations concerning the legal basis for the use of lethal force against United States citizens in a foreign country in certain circumstances. OLC withheld these documents pursuant to Exemption 5.

OLC also submitted a no number, no list response as to classified documents, stating that it could not provide the number or description of these documents because that information was protected from disclosure by Exemptions 1 and 3. OLC did describe one of these documents as an "OLC opinion related to DoD operations," Declaration of John E. Bies, Deputy Assistant Attorney General, OLC ¶ 38 ("Bies Decl."), JA 279, which it withheld in its entirety under Exemptions 1 and 3. This is apparently not the OLC-DOD Memorandum, which OLC said was exempt from disclosure under Exemption 5. That this document is not the

14

OLC-DOD Memorandum is confirmed by OLC's assertion that this document "cannot be further identified or described on the public record." Id. The OLC-DOD Memorandum was withheld under Exemptions 1 and 5.

OIP located one responsive document, a set of talking points prepared for the Attorney General and others related to "hypothetical questions about Anwar al-Aulaqi's death," Declaration of Douglas R. Hibbard, Deputy Chief of the Initial Request Staff, OIP ¶ 8, JA 441, which it released to ACLU. OIP also issued a Vaughn index listing four unclassified records withheld under Exemptions 3, 5, and 6.[8] OIP also submitted a no number, no list response to various classified documents withheld under Exemptions 1 and 3.

DOD's revised response disclosed a speech given by Jeh Johnson, then-DOD General Counsel, at Yale Law School on February 22, 2012. DOD also provided ACLU with a Vaughn index listing ten unclassified records, withheld pursuant to Exemption 5. Seven of those documents were e-mail traffic regarding drafts of the speech given by Johnson at Yale Law School and a speech delivered

---

[8] Exemption 6, which is not in issue in this appeal, applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (2013).

15

by Attorney General Holder at Northwestern University School of Law. One of the withheld unclassified records was a presentation by Johnson in February 2012, regarding international law principles, to officers who had recently obtained the rank of O-7. The remaining two withheld unclassified records were described as "memoranda from the Legal Counsel to the Chairman of the Joint Chiefs of Staff to the White House's National Security Council Legal Advisor addressing the legal basis for conducting military operations against U.S. citizens in general." Declaration of Robert E. Neller, Lt. General, United States Marine Corp, Director of Operations for the Joint Staff at the Pentagon, ¶ 16 ("Neller Decl."). JA 334.

DOD also located responsive classified records. One of these was the previously mentioned OLC-DOD memorandum, which DOD withheld under Exemptions 1 and 5. As to the other classified documents, DOD submitted a no number, no list response.

CIA modified its initial Glomar responses in June 2012 by confirming the existence of "responsive records reflecting a general interest" in two areas described in the ACLU's request: (1) "'the legal basis . . . upon which U.S. citizens can be subjected to targeted killing'" and (2) "'the process by which U.S. citizens can be subjected to targeted killing.'" Declaration

of John Bennett, Director, National Clandestine Service, CIA, ¶ 27 (quoting ACLU request). In these two categories, CIA submitted a no number, no list response, relying on Exemptions 1 and 3, with the exception that CIA acknowledged that it possessed copies of speeches given by the Attorney General at Northwestern University Law School on March 5, 2012, and by the Assistant to the President for Homeland Security and Counterterrorism on April 30, 2012. See id.

The pending lawsuit and District Court opinions. In December 2011, N.Y. Times filed a lawsuit challenging the denials of the Shane and Savage requests. ACLU filed its suit in February 2012. After the suits were consolidated, both Plaintiffs and the Government filed cross-motions for summary judgment. In January 2013, the District Court denied both Plaintiffs' motions for summary judgment and granted the Defendants' motion in both cases, with one exception, which required DOD to submit a more detailed justification as to why the deliberative process exemption (asserted through Exemption 5) applied to two unclassified memos listed in its Vaughn index. See Dist. Ct. Op., 915 F. Supp. 2d at 553. Later in January 2013, after receiving a supplemental submission from DOD, the District Court granted the Defendants' motion for summary

judgment with respect to the two unclassified DOD memos. See New York Times Co. v. U. S. DOJ ("Dist. Ct. Supp. Op."), Nos. 11 Civ. 9336, 12 Civ. 794, 2013 WL 238928 (S.D.N.Y. Jan. 22, 2013).

In its principal opinion, which we discuss in more detail in Parts III and IV, below, the Court first ruled that the Government had conducted an adequate search for responsive documents. See Dist. Ct. Op., 915 F. Supp. 2d at 532-33. The Court then considered separately each of the Government's claims to an exemption.

As to Exemption 1, concerning properly classified documents, the Court first ruled that there was no evidence that any of the documents withheld pursuant to Exemption 1 had not been properly classified. See id. at 535. The Court specifically considered the Plaintiffs' claim that legal analysis could not be classified and rejected the claim. See id.

Turning to the Plaintiffs' claim of waiver, the Court, citing Wilson v. CIA, 586 F.3d 171, 186 (2d Cir. 2009), first ruled that waiver of Exemption 1 had not occurred with respect to classified documents containing operational details of targeted killing missions. See Dist. Ct. Op., 915 F. Supp. 2d at 535-37. The Court then specifically considered whether waiver of Exemption 1 had occurred with respect to the OLC-DOD

18

Memorandum and rejected the claim. See id. at 538.

As to Exemption 3, which protects records exempted from disclosure by statute, the District Court first noted that section 102A(i)(1) of the National Security Act, now codified at 50 U.S.C. § 3024(i)(1) (2013), is an exempting statute within the meaning of Exemption 3, and that this provision protects from disclosure "intelligence sources and methods." Id. at 539. The Court then reckoned with ACLU's contention that placing individuals on kill lists does not fall within the category of intelligence sources and methods. Agreeing with a decision of a district court in the District of Columbia, ACLU v. Dep't of Justice, 808 F. Supp. 2d 280, 290-92 (D.D.C. 2011) ("Drone Strike Case"), which was later reversed on appeal, see ACLU v. CIA, 710 F.3d 422 (D.C. Cir. 2013), the District Court here rejected ACLU's argument. See Dist. Ct. Op., 915 F. Supp. 2d at 540. The District Court then specifically focused on the issue whether legal analysis could fall within the category of intelligence sources and methods. Acknowledging that it is "entirely logical and plausible" that intelligence sources and methods could be redacted from legal analysis upon in camera inspection, the Court declined to make such inspection or resolve the issue because it concluded that Exemption 5 "plainly applies" to the legal

19

analysis that is sought here. See id.

The District Court then determined that section 6 of the CIA Act, 50 U.S.C. § 403g, now codified at 50 U.S.C. § 3507 (2013), is an exempting statute within the meaning of Exemption 3 and that section 6 protects from disclosure information concerning the "functions" of CIA. See id. at 541. Again, following the district court decision in the Drone Strike Case, before it was reversed, the District Court here ruled that Exemption 3 permitted CIA, in response to ACLU's request, to refuse to reveal the existence of records concerning drone strikes. See id.

As to Exemption 5, covering "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," the District Court noted that this exemption applies to documents withheld "under the deliberative process privilege (a.k.a., the executive privilege) and the attorney-client privilege," citing this Court's decision in Tique v. U.S. Dep't of Justice, 312 F.3d 70, 76 (2d Cir. 2002). See Dist. Ct. Op., 915 F. Supp. 2d at 541-42. OLC relied on the deliberative process privilege to withhold the classified OLC-DOD Memorandum, which both Plaintiffs sought, and DOD relied on this privilege to withhold the two unclassified documents on its Vaughn index that ACLU requested. These two,

numbered 9 and 10, were described as "Memorandum from Legal Counsel to Chairman of the Joint Chiefs of Staff to the National Security Legal Advisor with legal analysis regarding the effect of U.S. citizenship on targeting enemy belligerents." JA 409.

With respect to the OLC-DOD Memorandum, the District Court, accepting N.Y. Times's concession that this document at one time might have been properly withheld under the deliberative process and/or attorney-client privileges, see id. at 544, rejected the Plaintiffs' contentions that these privileges had been lost because of one or more of the following principles: waiver, adoption, or working law, see id. at 546-50.

As to documents 9 and 10 on DOD's Vaughn index, the Court initially found DOD's justification for invoking Exemption 5 inadequate, see id. at 545, but ruled that a subsequent submission sufficiently supported the application of the deliberative process privilege and hence Exemption 5 to these documents, see Dist. Ct. Supp. Op., 2013 WL 238928, at *1.

Finally, the District Court considered the Glomar and no number, no list responses that were given by DOJ, DOD, and CIA. Apparently accepting the sufficiency of the affidavits submitted by officials of these agencies to justify the responses under Exemptions 1 and 3, the Court turned its attention to the

21

Plaintiffs' claims that these protections had been waived. Again, following the district court opinion in the Drone Strike Case, before it was reversed, the District Court here concluded that none of the public statements of senior officials waived entitlement to submit Glomar or no number, no list responses because "[i]n none of these statements is there a reference to any particular records pertaining to the [targeted killing] program, let alone the number or nature of those records." Dist. Ct. Op., 915 F. Supp. 2d at 553 (emphases in original).

Information made public after the District Court opinions.[9]

---

[9] As a general rule, a FOIA decision is evaluated as of the time it was made and not at the time of a court's review. See, e.g., Bonner v. U.S. Dep't of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing."). On this basis, the Government argues that we cannot consider any official disclosures made after the District Court's opinion.

We disagree. Although we are not required to consider such evidence, the circumstances of this case support taking judicial notice of the statements here. See Fed. R. Evid. 201(b)(2). The Government's post-request disclosures "go[] to the heart of the contested issue," Powell v. U.S. Bureau of Prisons, 927 F.2d 1239, 1243 (D.C. Cir. 1991) (internal quotation marks omitted), and, as discussed below, are inconsistent with some of its prior claims [redacted]. Taking judicial notice of such statements is the same course taken by the Court of Appeals for the D.C. Circuit in its recent ACLU v. C.I.A. decision. 710 F.3d at 431. We conclude that it is the most sensible approach to ongoing disclosures by the Government made in the midst of FOIA litigation.

Moreover, the Government's request for an opportunity to submit new material concerning public disclosures made after the District

22

After the District Court entered judgment for the Defendants, one document and several statements of Government officials that the Plaintiffs contend support their claims became publicly available. The document is captioned "DOJ White Paper" and titled "Lawfulness of a Lethal Operation Directed Against a U.S. Citizen Who Is a Senior Operational Leader of Al-Qa'ida or an Associated Force" ("DOJ White Paper"). As the Government acknowledges, see Br. for Appellees at 25, the 16-page, single-spaced DOJ White Paper was leaked to the press and subsequently officially disclosed by DOJ.[10] The leak occurred on February 4,

---

Court's decision was honored by affording the Government an opportunity, after oral argument, to submit such material ex parte for in camera inspection, which the Government has done.

[10] The DOJ White Paper was leaked to Michael Isikoff, a reporter with NBC News, according to a report available at http://nbcnews.to/U1ZII3; the text of the leaked document is available via a link at that website. (Hard copies of the documents available at this and all other websites cited in this opinion, as well as copies of videos available at websites cited in this opinion, to the extent they can be copied, have been docketed with the Clerk of Court for public reference.) The official disclosure, acknowledged by the Government, see Br. for Appellees at 25, was made by OIP on Feb. 4, 2013, in response to an FOIA request submitted by Truthout, according to a report available at http://www.truth-out.org/news/item/14585-targeted-killing-white-paper-leaked-to-nbc-news-turned-over-to-truthout-by-doj-in-response-to-a-six-month-old-foia-request-four-days-later; the text of the officially disclosed document is available via a link at that website and also at https://www.documentcloud.org/documents/602342-draft-white-paper.html. The document disclosed to Truthout is marked "draft"; the document leaked to Isikoff is not marked "draft" and is dated November 8, 2011. The texts of the two documents are identical, except that the document leaked to Isikoff is not dated and not marked "draft."

23

2013; the official disclosure occurred four days later.

The statements are those of John O. Brennan, Attorney General Eric Holder, and President Obama. Brennan, testifying before the Senate Select Committee on Intelligence on February 7, 2013, on his nomination to be director of CIA, said, among other things, "The Office of Legal Counsel advice establishes the legal boundaries within which we can operate." Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency Before the S. Select Comm. on Intelligence, 113 Cong. 57 (Feb. 7, 2013) ("Brennan Hearing"), available at http://www.intelligence.senate.gov/130207/transcript.pdf. Holder sent a letter to Senator Patrick J. Leahy, Chairman of the Senate

_____

ACLU contends that DOJ did not release the DOJ White Paper in response to its FOIA request, nor list it on its Vaughn index. See Br. for ACLU at 21 n.7. The Government responds that ACLU had narrowed its request to exclude "draft legal analyses," Letter from Eric A.O. Ruzicka to Sarah S. Normand (Apr. 3, 2012), and that the DOJ White Paper was "part of document number 60 on the Vaughn index submitted by the Office of Legal Counsel as an attachment to a responsive e-mail. See Br. for Appellees at 25 n.8. The OLC's Vaughn index describes document number 60 as "E-mail circulating draft legal analysis regarding the application of domestic and international law to the use of lethal force in a foreign country against U.S. citizens in certain circumstances, and discussion regarding interagency deliberations concerning the same" and invokes Exemption 5. Apparently, OLC expected ACLU to understand "circulating" to mean "attachment."

The Government offers no explanation as to why the identical text of the DOJ White Paper, not marked "draft," obtained by Isikoff, was not disclosed to ACLU, nor explain the discrepancy between the description of document number 60 and the title of the DOJ White Paper.

24

Judiciary Committee on May 22, 2013 ("Holder Letter").[11]  In that letter Holder stated, "The United States . . . has specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi," Holder Letter at unnumbered second page, and acknowledged that United States counterterrorism operations had killed Samir Khan and Abdulrahman al-Awlaki, who, he states, were not targeted by the United States, see id.  He also stated, "[T]he Administration has demonstrated its commitment to discussing with the Congress and the American people the circumstances in which it could lawfully use lethal force in a foreign country against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and is actively engaged in planning to kill Americans." Id.  He also stated, "The decision to target Anwar al-Aulaki was lawful . . . ." Id. at fourth unnumbered page.  President Obama delivered an address at the National Defense University on May 23, 2013.[12]  In that address, the President listed al-Awlaki's terrorist activities and acknowledged that he had "authorized the strike that took him out."

Discussion

---

[11] The Holder Letter is available at http://www.justice.gov/ag/AG-letter-5-22-13.pdf.

[12] The President's address is available via a link at http://wh.gov/hrTq.

I. FOIA Standards.

FOIA calls for "broad disclosure of Government records." CIA v. Sims, 471 U.S. 159, 166 (1985). The disclosure obligation is subject to several exemptions. However, "consistent with the Act's goal of broad disclosure, these exemptions have consistently been given a narrow compass." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (internal quotation marks omitted). Exemptions 1 (classified documents), 3 (documents protected by statute), and 5 (privileged documents), outlined above, have been invoked in this litigation. "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." Wilner, 592 F.3d at 69. To meet its burden of proof, the agency can submit "[a]ffidavits or declarations giving reasonably detailed explanations why any withheld documents fall within an exemption." ACLU v. Dep't of Justice, 681 F.3d 61, 69 (2d Cir. 2012) (internal quotation marks omitted).

We review de novo a district court's grant of summary judgment in FOIA litigation. See Wilner, 592 F.3d at 69. When an agency claims that a document is exempt from disclosure, we review that determination and justification de novo. See id.

26

When the claimed exemptions involve classified documents in the national security context, the Court must give "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." ACLU, 681 F.3d at 69 (emphasis in original) (internal quotation marks omitted).

II. Appellants' Claims

Narrowing the scope of the Shane request (OLC opinions that address the legal status of targeted killings) and the Savage request (OLC memoranda analyzing the circumstances under which it would be lawful to kill a United States citizen who is deemed to be a terrorist), Appellant N.Y. Times presses on appeal its request to OLC for disclosure of the OLC-DOD Memorandum. N.Y. Times also requests a Vaughn index of all withheld documents, instead of the no number, no list and Glomar responses it has received. See Br. for N.Y. Times at 51-52. ACLU seeks disclosure of the OLC-DOD memorandum; what it refers to as "the Unclassified Memos," Br. for ACLU at 50, 61, which are documents nos. 9 and 10 on DOD's Vaughn index, see Dist. Ct. Op., 915 F. Supp. 2d at 545; and "certain OLC memoranda that the agencies have not addressed in this litigation but whose existence they have officially acknowledged in public statements," Br. for ACLU at 50. ACLU also requests Vaughn indices and asks that OIP be

27

required "to renew its search for responsive documents." Br. for ACLU at 61.

III. The OLC-DOD Memorandum

The OLC-DOD Memorandum, as described by OLC, is an "OLC opinion pertaining to the Department of Defense marked classified . . .[t]hat . . . contains confidential legal advice to the Attorney General, for his use in interagency deliberations, regarding a potential military operation in a foreign country." Bies Decl. ¶ 30.

OLC withheld the OLC-DOD Memorandum as protected from disclosure by Exemption 5 "because it is protected by the deliberative process and attorney-client privileges." Id. DOD withheld the document under Exemptions 1 and 5 "because the content of the document contains information about military operations, intelligence sources and methods, foreign government information, foreign relations, and foreign activities." Neller Decl. ¶ 17. General Neller stated that the classified information in the OLC-DOD Memorandum "is not reasonably segregable." Id.

In upholding the application of Exemption 1 to the OLC-DOD Memorandum, the District Court first ruled that the affidavits supplied by senior Government officials demonstrated that

28

classification had been properly made. See Dist. Ct. Op., 915 F. Supp. 2d at 535. The Court then ruled that legal analysis may be classified, citing three district court opinions.[13] See id. After pointing out that Exemption 1 applies to documents properly classified pursuant to an Executive Order and that Executive Order No. 13526 "applies to any information that 'pertains to' military plans or intelligence activities (including covert action), sources or methods," id., the Court stated, "I see no reason why legal analysis cannot be classified pursuant to E.O. 13526 if it pertains to matters that are themselves classified," id.

In considering the application of Exemption 5 to the OLC-DOD Memorandum, the District Court noted the Government's claim that both the deliberative process and attorney-client privileges protected the document, and observed that N.Y. Times did not disagree that the document might at one time have been withheld under both privileges. See id. at 544.

After determining that Exemptions 1 and 5 applied to the

---

[13] New York Times Co. v. U.S. Dep't of Justice, 872 F. Supp. 2d 309, 312-13, 317-18 (S.D.N.Y. 2012), ACLU v. Office of the Director of National Intelligence, No. 10 Civ. 4419, 2011 WL 5563520, at *8 (S.D.N.Y. Nov. 15, 2011), and Center for International Environmental Law v. Office of the U.S. Trade Representative, 505 F. Supp. 2d 150, 154 (D.D.C. 2007).

OLC-DOD Memorandum, the Court considered and rejected the Plaintiffs' claims that the Government had waived application of these exemptions. With respect to waiver of Exemption 1, the Court stated that waiver occurs only where the government has "officially" disclosed the information sought, Dist. Ct. Op., 915 F. Supp. 2d at 536 (citing Halpern v. FBI, 181 F.3d 279, 294 (2d Cir. 1989)), and that official disclosure of classified information occurs only if the classified information is "'as specific as the information previously released,'" "'match[es] the information previously disclosed,'" and was "'made public through an official and documented disclosure,'" id. (quoting Wilson, 586 F.3d at 186). The District Court ruled that no official disclosure had been made concerning documents containing operational details of targeted killings, sought by ACLU, see id., and that none of the public pronouncements cited by the Plaintiffs "reveals the necessary detailed legal analysis that supports the Administration's conclusion that targeted killing, whether of citizens or otherwise, is lawful," id. at 538 (footnote omitted).

With respect to waiver of Exemption 5, the District Court ruled that the deliberative process privilege had not been waived because "there is no evidence that the Government continually

30

relied upon and repeated in public the arguments made specifically in the OLC-DOD Memo," id. at 549 (emphasis in original) (internal quotation marks omitted), and that "it is sheer speculation that this particular OLC memorandum . . . contains the legal analysis that justifies the Executive Branch's conclusion that it is legal in certain circumstances to target suspected terrorists, including United States citizens, for killing away from a 'hot' field of battle," id. The Court saw no need to consider the plaintiffs' claim of waiver in the context of the attorney-client privilege because the deliberative process privilege protected the OLC-DOD Memorandum under Exemption 5. See id.

We agree with the District Court's conclusions that the OLC-DOD Memorandum was properly classified and that no waiver of any operational details in that document has occurred. With respect to the document's legal analysis, we conclude that waiver of Exemptions 1 and 5 has occurred.[14] "Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption," Dow Jones & Co. v. U.S. Dep't of Justice, 880 F. Supp. 145, 150-51 (S.D.N.Y. 1995) (citing Mobil Oil Corp. v.

---

[14] We therefore need not consider the Appellants' claim that the legal analysis in the OLC-DOD Memorandum was not subject to classification.

E.P.A., 879 F.2d 698, 700 (9th Cir. 1989)), vacated in part on other grounds, 907 F. Supp. 79 (S.D.N.Y. 1995), and the attorney-client and deliberative privileges, in the context of Exemption 5, may be lost by disclosure, see Brennan Center for Justice v. U.S. Dep't of Justice, 697 F.3d 184, 208 (2d Cir. 2012).

(a) Loss of Exemption 5. Exemption 5 "'properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" Id. at 196 (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 153 (1975)). At the same time, we recognize that "the law extends the privilege to legal advice given by a lawyer to his client [because] statements by the lawyer often reveal – expressly or by necessary implication – assumptions of fact based on statements by the client," George A. Davidson & William H. Voth, Waiver of the Attorney-Client Privilege, 64 Oregon L. Rev. 637, 650 (1986).

In considering waiver of the legal analysis in the OLC-DOD Memorandum, we note initially the numerous statements of senior Government officials discussing the lawfulness of targeted killing of suspected terrorists, which the District Court

32

characterized as "an extensive public relations campaign to convince the public that [the Administration's] conclusions [about the lawfulness of the killing of al-Awlaki] are correct." Dist. Ct. Op., 915 F. Supp. 2d at 524. In a March 25, 2010, speech at the annual meeting of the American Society of International Law in Washington, D.C., then-Legal Adviser of the State Department Harold Hongju Koh said, "U.S. targeting practices, including lethal operations conducted with the use of unmanned aerial vehicles, comply with all applicable law, including the laws of war." JA 113, 124. In a February 22, 2012, speech at the Yale Law School, Jeh Johnson, then-General Counsel of DOD, "summarize[d] . . . some of the basic legal principles that form the basis for the U.S. military's counterterrorism efforts against Al Qaeda and its associated forces," JA 399, and referring explicitly to "targeted killing," said, "In an armed conflict, lethal force against known, individual members of the enemy is a long-standing and long-legal practice," JA 402.

In a March 5, 2012, speech at Northwestern University, Attorney General Holder said, "[I]t is entirely lawful – under both United States law and applicable law of war principles – to target specific senior operational leaders of al Qaeda and associated forces." JA 449. He discussed the relevance of the Due

Process Clause, id., and maintained that killing a senior al Qaeda leader would be lawful at least in circumstances where

> [f]irst, the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; second, capture is not feasible; and third, the operation would be conducted in a manner consistent with applicable law of war principles.

JA 450. Amplifying this last point, he stated that "use of lethal force by the United States will comply with the four fundamental law of war principles governing the use of force: . . . necessity[,] . . . distinction[,] . . . proportionality[,] . . . [and] humanity." Id. As the District Court noted, "The Northwestern Speech [by the Attorney General] discussed the legal considerations that the Executive Branch takes into consideration before targeting a suspected terrorist for killing" and "the speech constitutes a sort of road map of the decision-making process that the Government goes through before deciding to 'terminate' someone 'with extreme prejudice.'" Dist. Ct. Op., 915 F. Supp. 2d at 537.

In an April 30, 2012, speech at the Wilson Center in Washington D.C., John O. Brennan, then-Assistant to the President for Homeland Security and Counterterrorism, said, "Yes, in full accordance with the law, and in order to prevent terrorist

34

attacks on the United States and to save American lives, the United States Government conducts drone strikes against specific al-Qaida terrorists, sometimes using remotely piloted aircraft, often referred to publicly as drones." JA 95. On Feb. 7, 2013, Brennan, testifying on his nomination to be director of CIA, said, "The Office of Legal Counsel advice establishes the legal boundaries within which we can operate." Brennan Hearing at 57.

Even if these statements assuring the public of the lawfulness of targeted killings are not themselves sufficiently detailed to establish waiver of the secrecy of the legal analysis in the OLC-DOD Memorandum, they establish the context in which the most revealing document, disclosed after the District Court's decision, should be evaluated. That document is the DOJ White Paper, officially released on Feb. 4, 2013. See note 9, above. Before considering the relevance of the DOJ White Paper to the Government's claim to continued secrecy and privilege of the legal analysis in the OLC-DOD Memorandum, we describe that Memorandum, which we have examined in camera, in some detail.

The OLC-DOD Memorandum is a 41-page classified document, dated July 16, 2010, captioned:

MEMORANDUM FOR THE ATTORNEY GENERAL

35

*Re: [redacted[15]]*

It was prepared on the letterhead of OLC and signed by David J. Barron, Acting Assistant Attorney General.

The OLC-DOD Memorandum has several parts. After two introductory paragraphs, Part I(A) reports [redacted]. Parts I(B) and I(C) describe [redacted]. Part II(A) considers [redacted]. Part II(B) explains [redacted]. Part III(A) explains [redacted], and Part III(B) explains [redacted]. Part IV explains [redacted]. Part V explains [redacted]. Part VI explains [redacted].

The 16-page, single-spaced DOJ White Paper [redacted] in its analysis of the lawfulness of targeted killings. [redacted] The DOJ White Paper explains why targeted killings do not violate 18 U.S.C. §§ 1119 or 2441, or the Fourth and Fifth Amendments to the Constitution, and includes an analysis of why section 1119 encompasses the public authority justification. Even though the DOJ White Paper does not discuss 18 U.S.C. § 956(a)[redacted]. After the District Court's decision, Attorney General Holder publicly acknowledged the close relationship between the DOJ White Paper and previous OLC advice on March 6, 2013, when he

---

[15] We have deleted classification codes from the caption and throughout the document.

said at a hearing of the Senate Committee on the Judiciary that the DOJ White Paper's discussion of imminence of threatened action would be "more clear if it is read in conjunction with the underlying OLC advice."[16] Oversight of the U.S. Department of Justice Before the Senate Committee on the Judiciary, 113th Cong. (Mar. 6, 2013).

After senior Government officials have assured the public that targeted killings are "lawful" and that OLC advice "establishes the legal boundaries within which we can operate," and the Government makes public a detailed analysis [redacted], waiver of secrecy and privilege as to the legal analysis in the Memorandum has occurred.

The recent opinion of the District Court for the Northern District of California, First Amendment Coalition v. U.S. Dep't of Justice, No. 4:12-cv-01013-CW (N.D. Cal. April 11, 2014), denying an FOIA request for the OLC-DOD Memorandum, is readily distinguishable because the Court, being under the impression that "there has been no 'official disclosure' of the White Paper," id., slip op. at 24, did not assess its significance,

---

[16] The statement was made in a response to a question from Senator Mike Lee. A webcast of the hearing is available via a link at http://www.judiciary.senate.gov/hearings/hearing.cfm?id=e0c4315749c10b084028087a4aa80a73, at 1:51:30.

whereas in our case, the Government has conceded that the White Paper, with its detailed analysis of legal reasoning, has in fact been officially disclosed, see footnote 10, supra.

In resisting disclosure of the OLC-DOD Memorandum, the Government contends that making public the legal reasoning in the document will inhibit agencies throughout the Government from seeking OLC's legal advice. The argument proves too much. If this contention were upheld, waiver of privileges protecting legal advice could never occur. In La Raza, we explained that "[l]ike the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." 411 F.3d at 360. Here, the Government has done so by publicly asserting that OLC advice "establishes the legal boundaries within which we can operate"; it "cannot invoke that relied-upon authority and then shield it from public view." Brennan Center, 697 F.3d at 207-08. Agencies seeking OLC legal advice are surely sophisticated enough to know that in these circumstances attorney/client and deliberative process privileges can be waived and the advice publicly disclosed. We need not fear that OLC will lack for clients.

The Government also argues that because the OLC-DOD

38

Memorandum refers to earlier OLC documents that remain classified, those assessing the legal reasoning in the OLC-DOD Memorandum might find the reasoning deficient without an opportunity to see the previous documents. However, the reasoning in the OLC-DOD Memorandum is rather elaborate, and readers should have no difficulty assessing the reasoning on its own terms. Moreover, the Government had no similar concern when it released the DOJ White Paper, the reasoning of which cannot be properly assessed, on the Government's argument, without seeing the OLC-DOD Memorandum. Finally, the Government always has the option of disclosing redacted versions of previous OLC advice.

The loss of protection for the legal analysis in the OLC-DOD Memorandum does not mean, however, that the entire document must be disclosed. FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552b. The Government's waiver applies only to the portions of the OLC-DOD Memorandum that explain legal reasoning. These are Parts II, III, IV, V, and VI of the document, and only these portions will be disclosed. Even within those portions of the document, there are matters that the

Government contends should remain secret for reasons set forth in the Government's classified ex parte submission, which we have reviewed in camera.

One of those reasons concerns [redacted] the Government persuasively argues warrants continued secrecy. [redacted] We will redact all references to that [redacted].

Two arguments concern facts [redacted] that no longer merit secrecy. One is the identity of the country in which al-Awlaki was killed. [redacted[17]]

The other fact [redacted] that the Government contends merits secrecy is the identity of the agency, in addition to DOD, that had an operational role in the drone strike that killed al-Awlaki. Both facts have been redacted from this public opinion. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(b) Loss of Exemption 1. Much of the above discussion

---

[17] [redacted]

concerning loss of Exemption 5 is applicable to loss of Exemption 1. As the District of Columbia Circuit has noted, "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" Wolf v. CIA, 473 F.3d 370, 374-75 (D.C. Cir. 2007) (quoting Gardels v. CIA, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). But Gardels made it clear that the justification must be "logical" and "plausible" "in protecting our intelligence sources and methods from foreign discovery." 689 F.2d at 1105.

The District Court noted the Government's contention that "'[i]t is entirely logical and plausible that the legal opinion contains information pertaining to military plans, intelligence activities, sources and methods, and foreign relations.' (Gov't Memo. in Opp'n/Reply 6)." Dist. Ct. Op., 915 F. Supp. 2d at 540. But the Court then astutely observed, "[T]hat begs the question. In fact, legal analysis is not an 'intelligence source or method.'" Id.

We recognize that in some circumstances the very fact that legal analysis was given concerning a planned operation would risk disclosure of the likelihood of that operation, but that is not the situation here where drone strikes and targeted killings have been publicly acknowledged at the highest levels of the

41

Government. We also recognize that in some circumstances legal analysis could be so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts. Aware of that possibility, we have redacted, as explained above, the entire section of the OLC-DOD Memorandum that includes any mention of intelligence gathering activities. [redacted[18]]

The three-part test for "official" disclosure, relevant to Exemption 1, which the District Court took from Wilson, 586 F.3d at 536, has been sufficiently satisfied. [redacted] is "'as specific as the information previously released'" [redacted], it "'match[es] the information previously disclosed,'" and was "'made public through an official and documented disclosure.'" Dist. Ct. Op., 915 F.3d at 536 (quoting Wilson, 586 F.3d at 186). In reaching this conclusion, we do not understand the "matching" aspect of the Wilson test to require absolute identity. Indeed, such a requirement would make little sense. A FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed.[19]

---

[18] [redacted]

[19] Although we conclude that the three-part test of Wilson has been satisfied, and Wilson remains the law of this Circuit, we note that a rigid application of it may not be warranted in view of its questionable provenance. Wilson took the test from Wolf v. CIA, 473 F.3d 370, 378 (D.C. Cir. 2007), which took the test from Fitzgibbon v.

With the redactions and public disclosures discussed above, it is no longer either "logical" or "plausible" to maintain that disclosure of the legal analysis in the OLC-DOD Memorandum risks disclosing any aspect of "military plans, intelligence activities, sources and methods, and foreign relations." The release of the DOJ White Paper, discussing why the targeted killing of al-Awlaki would not violate several statutes, makes

CIA, 911 F.2d 755, 765 (D.C. Cir. 1990). Fitzgibbon purported to find the test in Afshar v. Dep't of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983). The issue in Afshar was whether several books submitted to CIA for clearance contained official disclosure of details of CIA's relationship with SAVAK, Iran's intelligence service prior to 1979 and the existence of a CIA station in Tehran prior to 1979. Afshar rejected the claim of official disclosure for three reasons: (1) none of the books revealed a continuing relationship between CIA and SAVAK after 1963, the date of the earliest withheld document; (2) the books provided only a general outline of such a relationship; and (3) none of the book was an official and documented disclosure. The second reason was supported by a citation to Lamont v. Dep't of Justice, 475 F. Supp. 761, 772 (S.D.N.Y. 1979), with a parenthetical stating that the withheld information must have "already been specifically revealed to the public" (emphasis in Afshar). Lamont did not assert specific revelation as a requirement for disclosure; it observed that the plaintiff had raised a factual issue as to whether the information sought had been specifically revealed. More important, Afshar, the ultimate source of the three-part test does not mention a requirement that the information sought "match[es] the information previously disclosed."

Wilson also cited Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy, 891 F.2d 414 (2d Cir. 1989). Clearwater also cited Fitzgibbon and Afshar and drew from those opinions more rigidity than was warranted. The issue in Clearwater was simply whether the Navy had previously disclosed, as the plaintiff claimed, that it was planning to deploy nuclear weapons at the New York Harbor Homeport. The Court rejected the claim, pointing out that the Navy had said only that the ships to be stationed at the Homeport were capable of carrying nuclear weapons. See id. at 421.

this clear. [redacted] in the OLC-DOD Memorandum adds nothing to the risk. Whatever protection the legal analysis might once have had has been lost by virtue of public statements of public officials at the highest levels and official disclosure of the DOJ White Paper.

IV. Legal Analysis in Other Withheld Documents[20]

In addition to seeking at least the legal analysis in the OLC-DOD Memorandum, ACLU also seeks disclosure of the legal analysis in documents numbered 9 and 10 on DOD's unclassified Vaughn index and in other OLC legal memoranda the existence of which ACLU contends have been officially acknowledged in public statements. See Br. for ACLU at 50. ACLU contends that Senator Feinstein said at the confirmation hearing of Brennan to be CIA director that there are eleven such memoranda, see id. at 50 n.25, of which four were provided to the Senate Select Committee on Intelligence, see id. at 24 & n.9.

---

[20] Other than the legal analysis in the documents considered in this section, it is unclear whether the Appellants are seeking on appeal any other withheld documents. See, e.g., Br. for ACLU at 50 ("Plaintiffs do not challenge the bulk of those withholdings."). In any event, except as to the OLC-DOD Memorandum discussed in Section III, above, the documents discussed in this Section IV, and the indices discussed in Section V, below, on the current record, we affirm the District Court's decision to withhold all other documents sought. After the Government submits its classified Vaughn indices on remand, the District Court may, as appropriate, order the release of any documents that are not properly withheld.

Documents numbered 9 and 10 are OLC legal memoranda, which were made available to this Court <u>ex parte</u> for <u>in camera</u> inspection. As to these documents, we agree with the District Court that the declaration of Richard C. Gross, Brigadier General, United States Army, JA 863, adequately supports the application of Exemption 5. <u>See</u> <u>Dist. Ct. Supp. Op.</u>, 2013 WL 238928, at *1. As General Gross pointed out, these brief documents (two and four pages respectively) are informal and predecisional. One does not even identify the sender or the receiver. They mention legal authorities, but in no way resemble the detailed, polished legal analysis in the disclosed DOJ White Paper. At most, they are "part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy." <u>Public Citizen, Inc. v. Office of Management and Budget</u>, 598 F.3d 865, 875 (D.C. Cir. 2010) (alteration in original) (internal quotation marks omitted). <u>See also Judicial Watch, Inc. v. FDA</u>, 449 F.3d 141, 151 (D.C. Cir. 2006) (protecting as deliberative "the give-and-take of the consultative process") (internal quotation marks omitted). No waiver of Exemption 5 has occurred with respect to these two documents.

45

[redacted]

V. <u>Glomar</u> and No Number, No List Responses

As set forth above, OLC, DOD, and CIA submitted either <u>Glomar</u> or no number, no list responses to the N.Y. Times and ACLU requests, in addition to <u>Vaughn</u> indices. For clarification, we set forth in the margin a chart showing the revised responses of the three agencies.[21] An agency may withhold information on the number of responsive documents and a description of their contents if those facts are protected from disclosure by a FOIA exemption. <u>See</u> <u>Wilner</u>, 592 F.3d at 67-69; <u>Hayden v. National Security Agency</u>, 608 F.2d 1381, 1384 (D.C. Cir. 1979). However, we agree with the D.C. Circuit that "[s]uch a response would only be justified in unusual circumstances, and only by a particularly persuasive affidavit." <u>ACLU</u>, 710 F.3d at 433.

The Government's core argument to justify the <u>Glomar</u> and no

---

[21]

| OLC: | DOD: | CIA: |
|---|---|---|
| <u>Glomar</u> to NYTimes; no number, no list to ACLU as to classified documents, except OLC-DOD Memorandum | no number, no list to Shane, <u>Glomar</u> to Savage, except OLC-DOD Memorandum; no number, no list to ACLU as to classified documents, except OLC-DOD Memorandum | <u>Glomar</u> to NYTimes; no number, no list to ACLU |

46

number, no list responses, as it was with the effort to withhold the OLC-DOD Memorandum, is that identification of any document that provides legal advice to one or more agencies on the legality of targeted killings "would tend to disclose the identity of the agency or agencies that use targeted lethal force against certain terrorists who are U.S. citizens . . . ." Br. for Appellees at 37. If one of those agencies is CIA, the Government's argument continues, disclosure of any information in a <u>Vaughn</u> index that "would tend to disclose the identity" of that agency must be protected because, the Government claims, "[T]he government has never disclosed (with the exception of the Bin Laden operation) whether the CIA has an operational role in the use of targeted lethal force or is authorized to use such force." <u>Id.</u> at 38.

[redacted[22]] The <u>Vaughn</u> index submitted by OLC <u>in camera</u> must be disclosed, and DOD and CIA must submit classified <u>Vaughn</u> indices to the District Court on remand for <u>in camera</u> inspection and determination of appropriate disclosure and appropriate redaction.

As was also true of the OLC-DOD Memorandum, however, the requirement of disclosing the agencies' <u>Vaughn</u> indices does not

_____

[22] [redacted]

47

necessarily mean that either the number or the listing of all documents on those indices must be disclosed. The Appellees argue persuasively that with respect to documents concerning a contemplated military operation, disclosure of the number of such documents must remain secret because a large number might alert the enemy to the need to increase efforts to defend against attacks or to avoid detection and a small number might encourage a lessening of such efforts. Accordingly, all listings after number 271 on OLC's Vaughn index will remain secret. See Wilner, 592 F.3d at 70 (upholding Glomar response as to identification of documents that would reveal "details of [a] program's operations and scope"). The descriptions of listing numbers 1-4, 6, 69, 72, 80-82, 87, 92, 103-04, 244-49, and 256 reveal information entitled to be protected. Listing numbers 10-49, 51-56, 84-86, 94, 101, 106-09, 111-12, 114-15, 251, 255, 257-61, and 266-67 describe email chains (or copies of chains). Because the Plaintiffs informed the District Court that they were not seeking these items, see Dist. Ct. Op., 915 F. Supp. 2d at 545, these listings need not be disclosed.

No reason appears why the number, title, or description of the remaining listed documents needs to be kept secret. Listing number 5 is the OLC-DOD Memorandum; listing numbers 7-9, 50, 250,

48

262-65, and 269-71 describe documents and attorney notes concerning legal advice; listing numbers 57-68, 70-71, 73-79, 83, 88-91, 93, 95-100, 102, 105, 110, 113, 116-22, and 144-45 are described as including factual information concerning al-Awlaki; listing numbers 123-30 are described as unclassified open source materials; listing numbers 131-43 and 148-237 are described as drafts of the OLC-DOD Memorandum; listing numbers 238-43 are described as drafts of other documents; listing numbers 146-47 are described as drafts of Document 86A, a listing that does not appear on the OLC's Vaughn index; and listing numbers 244, 246, 248, 252-54, 256, and 268 are described as including [redacted].

Some, perhaps all, of the information in many of these documents might be protected as classified intelligence information or predecisional. If the Plaintiffs challenge the applicability of a cited exemption, the District Court, after in camera inspection, will be able to determine which of these documents need to be withheld and which portions of these documents need to be redacted as subject to one or more exemptions that have not been waived. At this stage, we decide only that the number, title, and description of all documents listed on OLC's classified Vaughn index must be disclosed, with the exception of listing numbers 1-4, 6, 69, 72, 80-82, 87, 92,

49

103-04, 244-49; 10-49, 51-56, 84-86, 94, 101, 106-09, 111-12, 114-15, 251, 255-61, 266-67; and all listings after listing number 271.

Unlike OLC, DOD and CIA did not provide this Court with classified Vaughn indices, and we are unable to distinguish among listed document numbers, which titles or descriptions merit secrecy. We will therefore direct that, upon remand, DOD and CIA will provide the District Court with classified Vaughn indices listing documents responsive to the Plaintiffs' requests. From these indices, the District Court, with the guidance provided by this opinion, should have little difficulty, after examining whatever further affidavits DOD and CIA care to submit to claim protection of specific listings, to determine which listings on these indices may be disclosed. See ACLU, 710 F.3d at 432 (prescribing a similar procedure after rejecting a Glomar response).

VI. Adequacy of OIP's Search

Finally, ACLU argues that OIP did not make an adequate search because it did not disclose thirty e-mail chains with other DOJ offices that were found during OLC's search for responsive records. See Br. for ACLU at 60. However, as this Court has recognized, a search is not inadequate merely because

it does not identify all responsive records. See Grand Central Partnership, Inc. v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999). The adequacy of a search is not measured by its results, but rather by its method. See Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). To show that a search is adequate, the agency affidavit "must be relatively detailed and nonconclusory, and submitted in good faith." Grand Central Partnership, 166 F.3d at 489 (internal quotation marks omitted). The affidavit submitted by an OIP official, JA 412-419 ¶¶ 7-34, easily meets these requirements, and the November 3, 2011, cut-off date was reasonable as the date on which the search was commenced. See Edmonds Institute v. U.S. Dep't of Interior, 383 F. Supp. 2d 105, 110-11 (D.D.C. 2005).

## Conclusion

For the reasons stated above, we conclude that:

(1) a redacted version of the OLC-DOD Memorandum (attached as Appendix A to this opinion) must be disclosed;

(2) a redacted version of the classified Vaughn index submitted by OLC must be disclosed, including the number, title, and description of all documents, with the exception of listing numbers 1-4, 6, 10-49,

51

51-56, 69, 72, 80-82, 84-87, 92, 94, 101, 103-04, 106-09, 111-12, 114-15, 244-49, 251, 255-61, 266-67; and all listings after listing number 271;

(3) [redacted];

(4) the Glomar and "no number, no list" responses are insufficiently justified;

(5) DOD and CIA must submit Vaughn indices to the District Court for in camera inspection and determination of appropriate disclosure and appropriate redaction; and

(6) the OIP search was sufficient.

We therefore affirm in part, reverse in part, and remand.[23]

## Appendix A

OLC-DOD Memorandum after appropriate redactions and deletion of classification codes

[In this redacted version of the opinion, the entire redacted version of the OLC-DOD Memorandum has been redacted. *See* footnote 1, *supra.*]

---

[23] Prior to filing, we have made this opinion available to the Government in camera to afford an opportunity to advise whether any classified information, not intended to be disclosed by this opinion, has been inadvertently disclosed.